UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | 2:07-cr-00007 KJD-RJJ |
| ) | |
| ) | REPORT &  RECOMMENDATION |
| vs. ) | OF UNITED STATES |
| ) | MAGISTRATE JUDGE |
| ) | (Defendant's Motion to Suppress #20) |
| GABE DRAPEL, ) | |
| ) | |
| Defendant. ) | |

This matter was submitted to the undersigned Magistrate Judge on Defendant Gabe Drapel's Motion to Suppress (#20).  The Court has considered the Defendant's Motion to Suppress (#20), the Supplemental Exhibit in Support of Motion to Suppress Evidence (#21), Exhibit H (#22), the Government's Response (#27), and the Reply to the Government's Response (#28), in addition to the testimony and evidence presented at the evidentiary hearing.

## BACKGROUND

The defendant, Gabe Drapel was indicted by the Federal Grand Jury and charged with possession with intent to sell over 50 grams of controlled substances.  The indictment was the result of three searches that were conducted on December 19, 2006, pursuant to two separate warrants. The charge is based on 172.3 grams of methamphetamine discovered during the search of Storage West unit B177 at 2700 E. Flamingo road, Las Vegas, Nevada.

The testimony at the hearing, established that at approximately 8:30 pm, on December 18, 2006, detectives established surveillance at two of the locations, and Detective Grammas was driving to 2700 E. Flamingo in order to establish surveillance at the storage unit.  Drapel was observed by Detective Balonek leaving Storage West and driving east on Flamingo.  Further, Detective Grammas observed the defendant crossing the median on Flamingo and driving East

1  bound on Flamingo.  After leaving the storage unit, Drapel met Cinnamen Silas at the Food 4
2  Less at the corner of Flamingo and Pecos.  The two entered the store and exited approximately
3  two minutes later.  The detectives observed what appeared to be a hand to hand transaction and at
4  that time the detectives took both subjects into custody.  Drapel dropped 3 small plastic baggies
5  which tested positive for methamphetamine during an ODV test completed by Detective
6  Grammas.  Detective Balonek testified that he read Drapel his Miranda rights at 8:48pm.  At that
7  time, Detective Balonek explained to Drapel that a search warrant would be served at 3860
8  Osage Circle and 3546 Pueblo Way.  The defendant provided Detective Balonek with his keys,
9  which included the key to the Osage residence, the key to his vehicle, as well as the key to the
10 storage unit.
11       All of the detectives testified that 3546 Pueblo Way was searched first, followed by 3860
12 Osage Circle.  Last, after obtaining the second warrant signed by Judge Earl, the detectives
13 executed the search warrant for 2700 East Flamingo Road, Unit #B177.  The affiant of that
14 search warrant was Detective A. Guy.  The affidavit attached to the warrant for 2700 E. Flamingo
15 #B177 states that "two search warrants for 3860 Osage Circle and 3546 Pueblo Way have been
16 obtained and searched on 12-19-06 during the nighttime hours, your affiant prays this warrant
17 authorizes a night time search."
18       Detective Guy testified that he called Judge Loehrer to sign the warrant first; however,
19 she was unavailable.  He then proceeded through the list of judges until he reached Judge Earl.
20 Detective Guy also testified that he thought that Detective Balonek gave him the legal description
21 of the unit between 7-8:00 pm.  He began typing the warrant at approximately 7:00 pm and was
22 waiting for Detective Balonek to call with the legal description in order to complete the warrant.
23 He finished typing the warrant after receiving the legal description and went directly to Judge
24 Earl's house, arriving between 8:30-9:00 pm.  The drive takes approximately 20 minutes.
25 Detective Guy testified that he left the Judge's home at approximately 9:45 pm.  At the time
26 Detective Guy was at the Judge's house he believed that the other detectives had executed the
27 other two warrants or were in the process of executing the other two warrants.
28       Judge Earl testified that shortly after arriving home for the evening he received a call

1   from Detective Guy requesting that he review a search warrant. Approximately 25 minutes later,
2   Detective Guy arrived at Judge Earl's home. The testimony of Detective Guy and the Judge
3   confirmed that Detective Guy left copies of the search warrant and sealing order at his office. He
4   left the Judge's home while the Judge was reviewing the affidavit in order to retrieve the other
5   paperwork. Detective Guy was gone for approximately 40-50 minutes. The Judge testified that
6   Detective Guy left his home between 8-9:00 pm. The Judge said that the time is an estimate, but
7   not as to whether it was afternoon or evening.

8          Lillian Hicks, the manager of Storage West Self Storage testified that she was never
9   shown a search warrant for unit #B177. Hicks testified that a man identified as Karl Brosing
10  rented unit #B177 on December 18, 2006. Hicks identified the defendant, Gabe Drapel, as the
11  individual who rented the unit. Drapel picked his own code for the unit which she wrote on a
12  card for him. The main gate to the storage unit was accessible using the code. Hicks stated that
13  on December 18, 2006, an officer came in around 5-5:30 pm asking about a name that she did
14  not remember, but she did not have a unit rented to the individual named. Detective Balonek
15  contacted her again on December 19, 2006, with the name of Karl Brosing. She found
16  information on the individual but needed to determine whether she was able to disclose the
17  information. Approximately 20 minutes later, she faxed all of the information to Detective
18  Balonek. This was between 4:00 - 4:30 pm on December 19, 2006. The defendant testified that
19  the number in the right hand corner of the fax was the code to his unit. Detective Balonek
20  asserted that he was unaware of the code at all times.

21         Hicks stated that she did not see any police officers on December 19, 2006. She was in
22  the office during the office hours from 9:00 am to 6:00 pm. However, the police have automatic
23  access to enter through the gate and it would not register if they had entered. Hicks testified that
24  the log of the entries into unit #B177 is encoded as follows: key pad 1 means someone entered
25  the front gate, key pad 2 means someone exited the front gate, closed means that the door to the
26  specific unit was closed, and opened means the door to the specific unit was opened. The key
27  pad code is not necessary to enter the unit. There is a separate lock on the unit that Drapel
28  purchased, and which has a key that Drapel kept. If the code is entered it turns off the alarm to

1   the unit.  If the code is not entered at the front gate, the alarm will go off if the specific unit is
2   opened, even if it is accessed using the key.
3   　　　　The entry log shows that on December 19, 2006, at 8:10 pm, someone entered the front
4   gate using the code.  The door to the individual unit was opened and then closed.  At 8:19 pm
5   someone exited the main entrance using the code.  On December 19, 2006 at 10:28 pm the alarm
6   to unit #B177 went off.  Therefore, someone entered the unit without first entering the code.  The
7   unit door was opened and was subsequently closed at 10:59 pm.  The lock on the unit is still
8   intact, according to the manager.
9   　　　　Detective Grammas testified that he obtained the key to the storage unit from Detective
10  Balonek at the Osage residence.  He then met Detective Guy at the unit, who was waiting outside
11  the storage complex because his car did not have the automatic entry device to open the gate.
12  Detective Guy testified that he drove directly to the storage complex after leaving Judge Earl's
13  home.  The detectives then executed the search at unit #B177 around 10:28 pm.  At 2700 East
14  Flamingo Road, #B177, the detectives found a Taurus .38 revolver, serial number SH60063
15  which was reported stolen on September 7, 2006.  Also, a second Taurus .38 revolver was
16  discovered with an obliterated serial number.  The detectives found 172.3 grams of
17  methamphetamine in the storage unit.  Further, the detectives found 660 grams of a green-leafy
18  substance that tested positive for marijuana after an ODV test was conducted.  Detective
19  Grammas testified that Detective Lloyd took photographs of the unit at that time and then they
20  drove back to the Osage residence with the camera.
21  　　　　Subsequently, Drapel was questioned about the storage unit.  Drapel was advised that he
22  was being placed under arrest for trafficking in controlled substances. Detective Balonek stated
23  that Drapel was advised of the charges against him on the way to the police station, which was
24  well after midnight.
25  　　　　The defendant's theory is that Detective Balonek entered the storage unit prior to
26  obtaining the warrant from Judge Earl.  The defendant bases this assumption on the fact that the
27  police report states that "A search warrant was obtained for 3860 Osage Circle, 3546 Pueblo
28  Way, and 2700 East Flamingo #B177.  The affiant of the search warrant was myself, Detective S.

Balonek.  The warrant was served on December 19, 2006, at approximately 2108 hours, by members of the LVMPD S.W.A.T. Team." (Motion to Suppress (#20), Exhibit D).  However, the search warrant signed by Detective Balonek and endorsed by the Honorable Sally Loehrer does not mention 2700 E. Flamingo #B177.  The defendant argues that Detective Balonek entered the unit at 8:10 pm prior to obtaining the second search warrant.  The defendant asserts that the order of the photographs taken at the location of the three searches using a single camera further supports this contention.

First, the Court must determine whether or not the defendant has standing to challenge the search of the storage unit.  The unit was rented under the name of Karl Brosing.  The defendant informed Detective Guy on December 18, 2006, that he obtained a fake ID and rented a storage unit under that name so that it couldn't be traced back to him.  The defendant showed the undercover detective the fake I.D. which had the name Karl Brosing on it.  Second, if the defendant does have standing, the Court must determine whether the detectives searched the storage unit prior to obtaining the warrant, or if Detective Guy obtained the warrant while Drapel was in custody following the search of the two residences but before booking the defendant.

## DISCUSSION

*Standing*

"To invoke the Fourth Amendment protections, a person must show that he had a legitimate expectation of privacy.  A person demonstrates a legitimate expectation of privacy when that person has a (1) subjective expectation of privacy, and (2) an objectively reasonable expectation of privacy." United States v. Shryock, 342 F.3d 948, 978 (9th Cir. 2003), citing Smith v. Maryland, 442 U.S. 735, 740 (1979).  "[A] defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control' or 'common authority' over the property searched." U.S. v. Thomas, 447 F.3d at 1198.  "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." U.S. v. Matlock, 415 U.S. 164, 178 (1974).  It is the defendant who has the burden of proving a legitimate expectation of privacy. U.S. v. Caymen, 404 F.3d 1196, 1199 (9th Cir. 2004); Rawlings v. Ky., 448 U.S. 98, 104 (1980).

1    In U.S. v. Cunag, 386 F.3d 888, 895 (9th Cir. 2004), the Ninth Circuit determined that a
2 defendant who obtained a hotel room using a false name did not have a reasonable expectation of
3 privacy because "the hotel justifiably [took] 'affirmative steps to repossess the room.'"  The
4 procurement of the room by fraud did not extinguish the expectation of privacy by itself.  Here,
5 the defendant procured the storage unit through fraud using a false identity and a fake license.
6 Although the defendant leased the storage unit under a false name, the defendant still had a
7 subjective expectation of privacy in the storage unit, as well as, control and authority over the
8 unit.  The defendant testified that he rented the storage unit.  He paid lease and had his
9 belongings inside the unit.  The owner of the storage unit did not attempt to repossess the storage
10 unit at any point prior to the search.  Further, the detectives were aware that the storage unit was
11 in fact leased by the defendant.  The Fifth and Seventh Circuits have held "that individuals have
12 a reasonable expectation of privacy in packages addressed to them under fictitious names even
13 when the false names are used to distance the sender or recipient from the criminal nature of the
14 contents of the package.  U.S. v. Pitts, 322 F.3d 449, 457 (7th Cir. 2003), citing U.S. v. Villarreal,
15 963 F.2d 770, 774 (5th Cir. 1992); U.S. v. Richards, 638 F.2d 765, 770 (5th Cir. 1981).  The
16 circumstances here are similar in that the defendant used a fictitious name to distance himself
17 from the criminal nature of the contents of the storage unit.  This alone without affirmative steps
18 to repossess the unit is not sufficient to negate the defendant's reasonable expectation of privacy
19 in the unit.  Hicks testified that the lock the defendant purchased and put on the unit is still in
20 tact.  Therefore, at the time of the search the defendant had a reasonable expectation of privacy in
21 the unit.

*Notice Requirement*

23    "The notice requirement is not absolute and has not been fully defined by the United
24 States Supreme Court.  Most recently in Groh, the Court stated that 'neither the Fourth
25 Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing
26 officer to serve the warrant on the owner before commencing the search' under all
27 circumstances."  U.S. v. Martinez-Garcia, 397 F.3d 1205, 1211 (9th Cir. 2005), citing Groh v.
28 Ramirez, 124 S. Ct. 1284, 1292 (2004).  Here, the defendant was not even present at the storage

1  unit when the warrant was executed, nor was the manager of the Storage West Complex present
2  since the warrant was executed after office hours.  Therefore, it was not unreasonable for the
3  officers not to serve the warrant on Drapel or Hicks.
4  *Exclusionary Rule and Warrantless Search*
5        "[G]enerally, '[t]he government bears the burden of justifying a warrantless search.'"
6  U.S. v. Cortez-Rivera, 454 F.3d 1038, 1041 (9th Cir. 2006).  Here, the government has not
7  asserted that the search falls within one of the exceptions permitting a warrantless search.  The
8  government argues that the search was conducted after the warrant was acquired.  If in fact the
9  search was executed after the warrant was obtained there is not a Constitutional violation.
10 However, if the warrant was executed prior to Judge Earl signing the warrant as the defendant
11 contends, the evidence should be excluded.
12       Detective Balonek could not have entered the storage unit at 8:10 pm because he did not
13 have the key to the storage unit until after Drapel was taken into custody at 8:30 pm. All of the
14 evidence presented confirmed that the defendant was taken into custody at 8:30 pm. No evidence
15 was presented to the contrary.
16       The defendant argues that the fact that Detective Guy testified that Detective Balonek
17 called him prior to 7:00 pm with the legal description of the storage unit shows that Detective
18 Balonek was at the unit and searched the unit prior to obtaining the warrant.  However, the
19 evidence is to the contrary.  Even if Detective Balonek was aware that the code was written on
20 the fax that he received earlier that day, he did not have the key to unlock the unit door.  Further,
21 the defendant argues that Detective Balonek entered the unit prior to 7:00 pm and then asserts
22 that he entered the unit at 8:10 pm.  This is not consistent.  Detective Balonek testified that he
23 entered the storage west complex around 7:45 - 8:00 pm.  He testified that he passed the
24 defendant as he was waiting to exit the complex.  The Court finds Detective Balonek's testimony
25 to be credible, reliable, and uncontroverted.  There was absolutely no evidence to contradict the
26 detective's testimony.
27       The mere assertion that the order of the photographs supports the defendant's
28 unsupported theory is unpersuasive.  The only evidence presented regarding the photographs

1  taken of the storage unit by Detective Lloyd, was that Detective Lloyd was the individual who
2  took the photographs. Detective Lloyd did not testify. Further, Detective Guy testified that the
3  camera was returned to the Osage residence after leaving the storage unit. Detective Balonek
4  may have taken additional photographs at that time, or as he testified he may have clicked and
5  grabbed the photographs in order to put them on the CD in a different order than the pictures
6  were actually taken. Neither the memory card nor the camera were presented as evidence to
7  establish the defendant's position.

8  Although memories fade, and the times given by the witnesses may be off, the testimony
9  of all of the witnesses was credible and reliable and contradicts the defendant's theory. All of the
10 evidence in this case establishes that the detectives entered the storage unit only after obtaining
11 the warrant from Judge Earl. The Judge testified that he signed the warrant prior to 9:30 pm.
12 Further, Detective Guy and Detective Grammas both testified that the unit was searched at
13 approximately 10:30 pm. The storage unit time log confirms that someone without a code
14 entered the unit at 10:28 pm. Detective Guy did not have the access code to enter the main gate.
15 Both he and Detective Grammas testified that he had to wait for Detective Grammas to arrive
16 with a car that had the automatic gate access within the engine of the car. Based on all of the
17 testimony, it is evident that Detective Balonek was not aware of the access code to the Storage
18 West complex. Someone with the access code entered the main gate at 8:10 pm and opened the
19 door to the storage unit at 8:11 pm. This could not have been any of the detectives because they
20 did not obtain the keys until 8:48 pm. This fact is uncontested. Nobody entered the storage unit
21 again until 10:28 pm.

22 **CONCLUSION**

23 Since the unit was not accessed again until 10:28 pm, it is clear that the unit was not
24 searched prior to obtaining the search warrant from Judge Earl. There has not been an unlawful
25 search and seizure. The detectives searched the storage unit pursuant to a valid search warrant.
26 Therefore, the Motion to Suppress should be denied.
27 . . . .
28 . . . .

**RECOMMENDATION**

Based on the foregoing and good cause appearing therefore,

IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the Defendant's Motion to Suppress (#20) be **DENIED**.

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court on or before May 29, 2007**. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. Thomas v. Arn, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991); Britt v. Simi Valley United Sch. Dist., 708 F.2d 452, 454 (9th Cir. 1983).

DATED this  18th  day of May, 2007.

_____
ROBERT J. JOHNSTON
United States Magistrate Judge